**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SOUTHERN ELECTRIC CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 07-0575-CG-C** |
| | ) | |
| **UTILITIES BOARD OF THE CITY OF FOLEY, ALABAMA, d/b/a RIVIERA UTILITIES, et al.,** | ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **UTILITIES BOARD OF THE CITY OF FOLEY, ALABAMA d/b/a RIVIERA UTILITIES,** | ) ) ) | |
| | ) | |
| **Defendant/Counter-Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **SOUTHERN ELECTRIC CORPORATION,** | ) ) | |
| | ) | |
| **Plaintiff/Counter-Defendant.** | ) | |

**ORDER**

This matter comes before the court on the motions for summary judgment and partial

summary judgment filed by Southern Electric Corporation ("SEC") against Utilities Board of the

City of Foley, Alabama, d/b/a/ Riviera Utilities ("Riviera"), and by Riviera against SEC.  (Docs.

118, 123, and 128).  This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  No

party disputes personal jurisdiction or venue.

**I.    ALLEGATIONS**

SEC brought this diversity action against defendants, Riviera and Custom Engineering

Solutions ("CES").  (Doc. 1).  Riviera filed a counterclaim against SEC.  (Doc. 10).  The court will address the motions for summary judgment between CES and SEC in a separate order.

### A.     The Complaint

According to the complaint, Riviera hired SEC to provide labor and equipment for the installation of power lines.  (Doc. 1, p. 2, ¶ 8).  The contract between Riviera and SEC saddled Riviera with the duties of identifying locations to install the utility poles, providing plans for installing power lines, and furnishing all of the materials necessary to complete the project. (Doc. 1, p. 2, ¶ 8).

Riviera, in turn, hired CES to designate where SEC should install the utility poles to which the power lines would be attached.  (Doc. 1, pp. 2-3, ¶ 9).  The complaint alleges that the locations that CES designated for installation of the utility poles conflicted with a gas line and a fiber optic cable.  (Doc. 1, p. 3, ¶ 11).  In order to find suitable locations to install the utility poles, CES had to conduct additional surveys, delaying SEC's completion of the project.  (Doc. 1, p. 3, ¶ 11).  Relocating the utility poles required certain adjustments, which in turn forced SEC to supply additional manpower.  (Doc. 1, p. 3, ¶ 12).

In addition to the delays allegedly caused by having to adjust the locations for installation of the utility poles, SEC ran into difficulty in obtaining the materials it needed to complete the job.  (Doc. 1, p. 3, ¶ 13).  Riviera allegedly did not furnish the materials in a timely manner. Rather, many of the materials were stored roughly 27 miles from the location where they were to be used.  (Doc. 1, p. 3, ¶ 13).  Other materials were not "in stock," resulting in delay and requiring additional labor, or man hours, from SEC.  (Doc. 1, p. 3, ¶ 13).

The complaint brings three counts.  The first count is for breach of contract against Riviera.  SEC alleges that Riviera's purported failure to provide materials in a timely fashion and

Riviera's change in the plan drawings for installation of the utility poles - which Riviera did through its agent, CES - constitutes a breach of contract. (Doc. 1, p. 4, ¶¶ 16-18). Count Two seeks penalty interest pursuant to ALA. CODE § 8-29-3 (1975), because SEC was not paid within 30 days after it requested payment. (Doc. 1, p. 5, ¶¶ 19-20). Count Three alleges that CES breached a duty of care it owed to SEC when it initially indicated locations for installing the utility poles that conflicted with underground utilities in the area. (Doc. 1, p.5, ¶¶ 21-23).

**B.      The Counterclaim**

According to the counterclaim, SEC was contractually required to complete the work outlined in the contract documents and specifications for the project by a date certain. (Doc. 10, p. 8, ¶ 2). SEC allegedly breached its contract with Riviera when it did not perform its work properly or on time. (Doc. 10, p. 8, ¶ 3). Riviera seeks liquidated damages or, in the alternative, compensatory damages for breach of contract. (Doc. 10, pp. 8-9, ¶¶ 4-5).

**II.      SUMMARY JUDGMENT STANDARD**

Under Rule 56© of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56©. The movant bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

As succinctly stated by the Eleventh Circuit:

A factual dispute is genuine only if "a reasonable jury could return a verdict for the nonmoving party." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (citation omitted). The moving party bears the

burden of proving that no genuine issue of material fact exists.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the district court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Info. Sys. and Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224-25 (11th Cir. 2002).  The purpose of summary judgment "is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 592 (11th Cir. 1995), cert. denied sub nom. Jones v. Resolution Trust Corp., 516 U.S. 817 (1995).

In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him."  Ryan v. Int'l Union of Operating Engrs, Local 675, 794 F.2d 641, 643 (11th Cir. 1986).  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Blue Cross & Blue Shield v. Weitz, 913 F.2d 1544, 1550 (11th Cir. 1990).  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994)(citing Lazzara v. Howard A. Esser, Inc., 802 F.2d 260, 269 (7th Cir. 1986)), cert. denied, 513 U.S. 868, 115 S.Ct. 189, 130 L.Ed.2d 122 (1994).

Id. at 599.  The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The failure by the nonmoving party to make a sufficient showing on an essential element of its action entitles the moving party to judgment as a matter of law.  Id. at 323.

## III.    SEC'S MOTION FOR SUMMARY JUDGMENT IS GRANTED.

SEC's motion for summary judgment argues that the liquidated damages provision in the

contract between SEC and Riviera is unenforceable. (Doc. 118). As such, SEC seeks judgment on Riviera's claim for liquidated damages, which would leave Riviera with the burden of establishing actual damages for breach of contract. The liquidated damages provision at issue provides as follows:

> It is mutually agreed between the parties hereto that time is the essence of this CONTRACT, and in the event the construction of the Work is not completed within the time specified in the Proposal, it is agreed that from the compensation otherwise to be paid to the CONTRACTOR, the OWNER may retain the sum of $500 per day for each day thereafter, Sundays and holidays included, that the Work remains uncompleted.

(Doc. 118-2, p. 1; Doc. 158-2, p. 7).

The Supreme Court of Alabama set out the relevant law in Camelot Music, Inc. v. Marx Realty & Improv. Co., 514 So. 2d 987 (Ala. 1987).

> It is true in Alabama that, because penalty provisions are void as against public policy, "Courts . . . are disposed to lean against any interpretation of a contract which will make the provision one for liquidated damages and, in all cases of doubtful intention, will pronounce the stipulated sum a penalty." In Alabama, liquidated damages are a sum to be paid in lieu of performance, while a penalty is characterized as a security for the performance of the agreement or as a punishment for default. The courts generally identify three criteria by which a valid liquidated damages clause may be distinguished from a penalty. First, the injury caused by the breach must be difficult or impossible to accurately estimate; second, the parties must intend to provide for damages rather than for a penalty; and, third, the sum stipulated must be a reasonable pre-breach estimate of the probable loss. Determining whether a liquidated damages provision is valid is a question of law to be determined by the trial court based on the facts of each case.

Id. at 990 (alteration in original; citations omitted). See also Milton Constr. Co. v. State Highway Dep't, 568 So. 2d 784, 790-91 (Ala. 1990) (applying Camelot Music) overruled in part on other grounds by Ex parte Ala. DOT, 978 So. 2d 17, 23 (Ala. 2007); Sutton v. Epperson, 631 So. 2d 832, 835 (Ala. 1993) (same); Stonebrook Dev., L.L.C. v. Matthews Bros. Constr. Co., 985 So. 2d 960, 965 (Ala. Civ. App. 2007) (same).

On summary judgment, the court should "apply the standards of <u>Camelot Music</u> to the factual inferences most favorable to the non-moving party. . . . If the liquidated damages clause fails to meet any one of the three criteria, it must fail as a penalty." <u>Sutton</u>, 631 So. 2d at 836.

The court finds that summary judgment is due to be granted based on the second criterion in <u>Camelot Music</u>, whether "the parties . . . intend[ed] to provide for damages rather than for a penalty." <u>Camelot Music</u>, 514 So. 2d at 990. As the Supreme Court of Alabama interpreted this second criterion in the subsequent <u>Milton Constr.</u> case, if the clause "acts as a discouragement or penalty for late completion" of a project, rather than as an estimate of future damages, the second factor is not met. <u>Milton Constr.</u>, 568 So. 2d at 791. <u>See also</u> <u>Cook v. Brown</u>, 408 So. 2d 143, 144-45 (Ala. Civ. App. 1981) (liquidated damages a penalty because the parties did not anticipate a breach or negotiate "for an acceptable measure of possible damages in the event of a breach.").

Donald Boone ("Boone") testified that the $500 per day of liquidated damages "was just a number that we generated to get the job completed." (Doc. 118-3, p. 2). Riviera was motivated by a desire to have the completion of SEC's project coincide with the completion of another project (Doc. 118-3, p. 3), but the liquidated damages clause could not have been "intend[ed] to provide for damages rather than for a penalty," <u>Camelot Music</u>, 514 So. 2d at 990, because there was no analysis as to how much damage Riviera would suffer for every day of delay. (Doc. 118-3, pp. 2-3).[1]

_____

[1] Likewise, Mike Noori ("Noori"), the president of CES, testified that this "was an important project. Usually Riviera uses $300-per-day liquidated damages, but . . . they wanted to get this project on time," so that it would coincide with other work in the area. (Doc. 118-4, pp. 2-3). According to Noori, Riviera "wanted to imply the importance of that," so they increased the liquidated damages from their standard $300 per day to $500 per day. (Doc. 118-4, pp. 2-3). CES is not a party to the contract and, although Noori's testimony certainly supports

Riviera argues that it "needed the job completed in a timely fashion in order to tie it in with" another project, so it included the liquidated damages clause "[b]ecause of the necessity for getting this job done on time and in a proper manner." (Doc. 158, p. 8). This argument does not do much to counter SEC's motion because, "[i]n Alabama, . . . a penalty is characterized as a security for the performance of the agreement or as a punishment for default." Camelot Music, 514 So. 2d at 990. The affidavit of Boone that Riviera attaches to its response is no more helpful to Riviera. In relevant part, Boone avers that Riviera included the liquidated damages clause in its contract with SEC,

> in an attempt to provide adequate compensation to Riviera in the event of a breach. Although we hoped that the liquidated damage provision would serve as a reminder to SEC of the importance of getting the job completed in a timely manner, the inclusion of this liquidated damages provision in the contract was not intended as a penalty to the contractor, but was simply intended to protect Riviera Utilities in the event of a breach.

(Doc. 158-2, p. 4, ¶ 5).

Boone's deposition and affidavit testimony specifically support the conclusion that the liquidated damages clause was intended to discourage late completion of the project. Boone concludes in his affidavit that Riviera did not intend to punish SEC when it included a clause specifically engineered to discourage slow performance and to remind SEC that timeliness was important to Riviera. The affidavit falls short of creating a genuine issue of material fact on the point that Riviera seeks to advance, especially in light of the fact that Boone makes no effort to show how the clause was intended to compensate Riviera with damages. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (FED. R. CIV. P. 56(e) is not intended "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); Avirgan v.

---

SEC's theory, it is unnecessary to the resolution of this motion.

Hull, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial. The evidence presented cannot consist of conclusory allegations or legal conclusions.") (citations omitted). Based on the foregoing, SEC's motion for summary judgment on the liquidated damages clause in the contract is **GRANTED**.

## IV. RIVIERA'S MOTION FOR SUMMARY JUDGMENT IS GRANTED IN PART AND DENIED IN PART.

Riviera's motion for summary judgment seeks judgment in its favor on both of the counts that SEC brings against it: Count One for breach of contract and Count Two for penalty interest pursuant to an Alabama statute. (Docs. 123 and 124). The motion does not appear to seek summary judgment in Riviera's favor on Riviera's counterclaim for breach of contract. (See, e.g., Doc. 123-2, p. 2). SEC candidly concedes Riviera's motion as to Count Two. (Doc. 172, p. 1 n.1). Summary judgment is therefore **GRANTED** as to Count Two.

As alleged, Count One for breach of contract in SEC's complaint against Riviera says as follows:

> Riviera failed to provide materials in a timely fashion and changed the drawings after SEC began construction of the power lines as a result of its agent, CES, providing faulty locations of poles on both County Road 64 and State Road 98, which constitutes a breach of the agreement between the parties.

(Doc. 1, p. 4, ¶ 17).

### A. Facts

SEC bid on the project at issue in late February 2006. (Doc. 126-8, p. 2). It won and executed the contract with Riviera in March 2006. (Doc. 127-2; Doc. 127-3). SEC was told to finish the work by June 12, 2006. (Doc. 127-3). The project was completed on February 12,

2007.  (Doc. 127-6, pp. 5-6).

Tom Lofton ("Lofton") was primarily responsible for preparing the bid on SEC's behalf.

(Doc. 127-5, p. 4).  Due to the nature of the area where the project would take place, the

intersection of County Road 64 and Highway 98 in Daphne, Alabama, SEC anticipated that there

would be underground utilities in the area.  (Doc. 127-7, pp. 3-4; Doc. 127-8, pp. 4-5).  Section

203.B of the contract provides:

> **UNDERGROUND UTILITIES:** Contractor shall verify the existence and location of
> underground structures and utilities in accordance with the State of Alabama's
> Underground Damage Prevention Act to assure conflicts will be avoided in the
> construction of this Work.  Damages inflicted on utilities or structures by the
> Contractor's activities shall be repaired or replaced at the Contractor's expense.

(Doc. 126-3, p. 9).

Tom Hulsey ("Hulsey") was SEC's initial crew foreman for this job.  (Doc. 127-9, pp. 3-

6).  He arrived in Daphne with his crew to start the job by April 15, 2006.  (Doc. 127-9, pp. 3-6).

Tommy Gore ("Gore") was SEC's General Superintendent at the time.  (Doc. 127-9, p. 4; Doc.

127-8, p. 3).  Gore showed Hulsey the site and told him to begin the work.  (Doc. 127-9, pp. 3-

5).  Hulsey's crew proceeded to unload the utility poles, which arrived at a rate of roughly two

loads per day, but they were delayed for a day because their crane did not have the proper sling

to unload the utility poles.  (Doc. 127-9, pp. 7-8).  Once Hulsey's crew obtained the sling they

needed, they were able to unload the poles.  (Doc. 127-9, p. 8).  Hulsey does not recall how long

it took to unload the utility poles.  (Doc. 127-9, p. 9).

Hulsey's crew started to spread the electrical wire and to frame some of the utility poles

with material after the poles were unloaded.  (Doc. 127-9, pp. 10-11).  SEC needed a separate,

larger crane to set the poles.  (Doc. 127-9, pp. 11-12).  The operator for the second crane refused

to set the poles that were already framed, which meant that Hulsey's crew had to deframe the

poles it had already framed before they could be set. (Doc. 127-9, p. 12). According to an engineer, Donald Boone ("Boone"), utility poles such as the ones at the job site are commonly not framed prior to having a crane set the poles in order to avoid causing damage. (Doc. 127-10, pp. 3-4, 7-8).

When Hulsey's crew started digging the holes in which to set the utility poles, they ran into conflicts with underground utilities. (Doc. 127-9, p. 13). As set out in Section 203.B of the contract between SEC and Riviera, SEC was required to contact Alabama 1 Call to obtain "locates" on existing underground utilities in the area. (Doc. 126-3, p. 9). Alabama 1 Call is a call center where contractors can call to learn the location of underground utilities in areas where they plan to work. (Doc. 127-11, pp. 3-5). After Alabama 1 Call receives the information it needs from the inquiring party, it notifies the owners of underground utilities in the area, which in turn endeavor to locate their underground utilities in the area. (Doc. 127-11, pp. 3-5). The utility companies mark the existing facilities with a "tolerance zone" of 18 inches, meaning that a party working in the area is not supposed to use most mechanized equipment within 18 inches of where the utility companies mark their facilities. (Doc. 127-11, pp. 6-7). If a contractor such as SEC wants to dig within the 18-inch tolerance zone, it must determine the exact location of the pre-existing underground facility, something it does by digging by hand or with a vacuum excavation device. (Doc. 127-11, pp. 6-7).

CES prepared the engineering plans for this project and identified the pole locations. (Doc. 127-13, p. 4). Jerry Haynes ("Haynes") was CES's employee in the field with responsibility for managing this project. (Doc. 127-13, p. 3). Haynes personally staked out the locations where CES directed SEC to set the utility poles. (Doc. 127-14, pp. 3-5). SEC could move the utility pole locations from where CES staked them within the line provided by CES.

(Doc. 173-4, p. 5). If SEC wanted to move the utility poles off of that line, CES had to check the new proposed location against its engineering plans to make sure that the project would still work correctly. (Doc. 173-4, p. 5).

Lofton called Alabama 1 Call for the locates in early April 2006. (Doc. 127-9, p. 14). Hulsey planned to have his crew use a digger truck with a 36-inch auger to dig the holes for the utility poles. (Doc. 127-9, pp. 16-17). Due to the number of underground utilities located in the area, he could not use his mechanized auger to dig. (Doc. 127-9, pp. 16-17). SEC first notified Haynes at CES of the conflicts with underground utilities around May 17 or 22, 2006. (Doc. 127-6, pp. 5-6; Doc. 127-13, pp. 5-8).

Gary Wall ("Wall") was a crew foreman for SEC and was sent to the project by Gore, his supervisor, around May 20, 2006. (Doc. 127-15, pp. 3, 8-9). Wall was unaware of the conflicts with the underground utilities when he arrived at the site, but he regularly runs into such conflicts on projects similar to the one at issue. (Doc. 127-15, pp. 10-11). When he encounters such conflicts, he generally has his crew hand dig to locate the pre-existing underground utility and then use the mechanical auger to finish the digging process. (Doc. 127-15, pp. 11-12).

CES altered its engineering plans to relocate the pole locations for the section of the project on Highway 98 by June 2, 2006. (Doc. 127-13, p. 11). SEC did not have to shut down work while the poles were being relocated because it had other work it could be doing in the meanwhile. (Doc. 127-9, p. 21). Once the holes were relocated, SEC was able to set the poles along Highway 98. (Doc. 127-9, pp. 21-22). The utility poles were still unframed when they were set along Highway 98. (Doc. 127-9, p. 22).

SEC was able to work on installing the utility poles on Highway 98 while Riviera investigated new locations for the utility poles along County Road 64. (Doc. 127-8, pp. 7-8).

CES issued revised locations for the utility poles installations on County Road 64 on June 30, 2006, which was after the June 12, 2006, completion date indicated in the contract. (Doc. 125, p. 8, ¶ 11; Doc. 172, p. 3). When the new "locates" were called in after the new utility pole locations were designed for County Road 64, they differed from the prior locates for County Road 64, causing some conflict with the new pole locations that CES provided. (Doc. 127-13, p. 14). CES promptly provided acceptable locations for the conflicting utility poles. (Doc. 127-8, p. 7). CES did not view the conflict as hindering the progress of the job because SEC did not have a crane to set the poles at the time. (Doc. 127-13, p. 16). SEC also had other work to do while the design problems on County Road 64 were being resolved. (Doc. 127-5, p. 5; Doc. 127-15, pp. 5-6).

With respect to the claim that Riviera did not timely provide materials for SEC to use on the project, SEC did not keep a written inventory of the materials it used. (Doc. 127-6, p. 7). Some of the materials were stolen or left on the side of the road. (Doc. 127-15, pp. 4 and 13; Doc. 127-13, p. 9). Gore testified that Riviera did not initially have certain bolts for SEC to use. (Doc. 127-8, pp. 17-18). The bolts SEC wanted were not standard and, although Riviera had bolts that could have been used, it ordered the bolts that SEC requested. (Doc. 127-8, pp. 17-18; Doc. 127-12, pp. 26-27). The bolts were received in eight days. (Doc. 127-12, pp. 26-27). Gore was aware of one other problem with the materials. (Doc. 127-8, p. 18). Some cross-arms did not have holes in the right locations. (Doc. 127-8, p 18; Doc. 127-12, pp. 25-26). Riviera drilled the necessary holes in the cross-arms, a project that took its employee approximately five hours. (Doc. 127-12, pp. 25-26; Doc. 127-16, p. 11; Doc. 127-17, pp. 8-9).

As for other delays on the project, Gore testified that he did not have the crane he needed to set the utility poles at one point and that he had problems with his work crews and two of his

foremen.  (Doc. 127-8, pp. 9-11).  Gore also explained that conflicts with the expected utility pole locations and underground utilities delayed the project.  (Doc. 127-8, p. 12).  Wall testified that material shortages by Riviera forced him to redo some work, which cost him time.  (Doc. 173-12, pp. 2-4).  In other words, the lack of materials fragmented SEC's efforts, frustrating its ability to work according to plan and forcing it to redo some of its work.  (Doc. 173-15, pp. 2-3).

Buddy Burkes ("Burkes"), one of SEC's Rule 30(b)(6) representatives, testified that he could not identify what materials were unavailable or when particular materials were unavailable between August 15, 2006, and October 30, 2006.  (Doc. 127-6, pp. 8-9).  He said that a foreman that SEC brought in to the job during the middle of July 2006, Curly Wayne Hynum ("Hynum"), could best speak to that issue.  (Doc. 127-6, pp. 9 and 10).  Hynum explained that SEC was delayed by weeks or more than a month because of waiting on material while Hynum was working on the project.  (Doc. 127-16, p. 4; Doc. 173-9, p. 5).

Burkes testified that he met with Riviera on August 15, 2006, to discuss how the project redesign and lack of materials had delayed the project.  (Doc. 173-10, pp. 4-6).  At the August 15, 2006, meeting, Burkes discussed an extension of time to complete the project because of the pole relocations and concerns about material availability.  (Doc. 173-10, pp. 4-6, 10).  Burkes was told to put his concerns in a letter, which he did on August 18, 2006.  (Doc. 173-10, pp. 4-6, 10).  The letter listed the reasons for the delays, listed materials the SEC needed, and asked to extend the contract to October 30, 2006.  (Doc. 173-10, pp. 4-6).  Hynum helped prepare that list.  (Doc. 127-16, pp. 8-9).  When SEC prepared the list, it did not check with Riviera's Foley warehouse to see what materials were available there.  (Doc. 127-16, p. 10).

Burkes testified that SEC's concerns about material availability were not adequately addressed by October 2006, so Burkes called another meeting with CES and Riviera.  (Doc. 173-

10, pp. 6-7).  At the ensuing October 12, 2006, meeting, Burkes discussed the lack of materials and the consequent difficulty for SEC to finish the project by October 30, 2006.  (Doc. 173-10, pp. 7-9).  Burkes also mentioned that nobody had responded to his August 2006 letter.  (Doc. 173-10, p. 9).

If SEC had to wait for particular materials, there were other materials that could be used on the job site, so SEC was never completely prevented from working.  (Doc. 127-16, pp. 11-14).  Hynum cannot say when any materials arrived at the site or when they were used.  (Doc. 127-16, pp. 13-14).  He also cannot say how many extra man hours SEC had to contribute to the project due to any lack of materials.  (Doc. 127-16, p. 14).  On the other hand, Hynum did testify that material shortages occurred continuously, causing his crews to move around the job site a lot.  (Doc. 173-9, pp. 2-3).  He also said that the shortage of materials delayed progress on Highway 98 and County Road 64 by more than a month.  (Doc. 173-9, p. 5).

Haynes checked on the project on an almost daily basis.  (Doc. 127-14, p. 7).  He only recalls SEC complaining about materials on a couple of occasions.  (Doc. 127-14, pp. 7-8).  On one occasion, SEC said it needed cross-arms.  (Doc. 127-14, p. 7).  Haynes told SEC to check with the Foley warehouse and never heard back from SEC on the issue.  (Doc. 127-14, pp. 7-8).  On the only other occasion Haynes recalls, SEC indicated that it could not get certain shackles.  (Doc. 127-14, pp. 8-9).  Haynes went to the Daphne warehouse, picked up the shackles, and brought them to SEC at the site that same day.  (Doc. 127-14, pp. 8-9).  Haynes was not aware of any other instances of SEC having problems with materials on the job or of any material issues that delayed SEC's work.  (Doc. 127-14, p. 9).

Pete Clausen ("Clausen") is the storekeeper for Riviera's Daphne warehouse.  (Doc. 127-17, p. 3).  Clausen assembled most of the material he had for the job and placed it in an area of

the yard where SEC could retrieve it.  (Doc. 127-17, pp. 7-8).  Clausen recalls SEC requesting

additional materials in the form of connectors, bolts, and smaller insulators, which were kept

inside the warehouse as opposed to in the yard.  (Doc. 127-17, p. 8).  Clausen does not recall

SEC complaining about a lack or shortage of materials, but he does recall occasions when SEC

had to obtain some materials from Riviera's Foley warehouse.  (Doc. 127-17, p. 6).

In summary, SEC says, and has facts that tend to show, that the project was delayed

because CES had to adjust its planned location of the utility poles to avoid conflicts with

underground utilities and because Riviera did not have the necessary materials available in a

timely fashion.  Riviera says, and has facts that tend to show, that at least some of the delay is

attributable to SEC.

### B.     Analysis

This is a breach of contract claim arising under Alabama law.  "To establish a breach-of-

contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties in

the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and

(4) damages."  Ex parte Coleman, 861 So. 2d 1080, 1085 (Ala. 2003) (internal quotations

omitted).  As SEC points out, Alabama law provides that "[g]enerally, contracting parties

impliedly promise not to act so as to hinder, prevent, or make more burdensome the other's

performance.  A breach of this implied promise may be construed as an actual breach of the

contract, thereby giving the other party a cause of action on the contract."  Eager Beaver Buick,

Inc. v. Burt, 503 So. 2d 819, 822 (Ala. 1987), overruled in part on other grounds by Elmore

County Com. v. Ragona, 540 So. 2d 720, 724-25 (Ala. 1989).

SEC points to Section 205 of the contract to support its argument that Riviera breached

the contract when it did not timely deliver materials to the project.  (Doc. 172, p. 13; Doc. 173-2,

p. 59).

> **SOURCE OF SUPPLY AND QUALITY OF MATERIALS:** Owner will supply materials including, but not limited to, poles, conductor, insulators, cross-arms, bolts, line hardware, dampers, and connectors. Contractor will supply the #67 crushed limestone specified for pole installation in Section 304. Only materials conforming to the requirements of the Specifications shall be incorporated in the Work. Material which has become, in any way, unfit for use shall not be used in the Work. Materials, except for poles, will be available for pickup at the Owner's warehouse on North Poplar Street in Foley, Alabama and/or on Pollard Road in Daphne, Alabama.

(Doc. 173-2, p. 59). Riviera also was responsible for designing the project, including for determining where the utility poles were to be erected. (Doc. 173-2). Riviera's reply brief does not argue that the basic rule of law set forth in <u>Eager Beaver Buick</u> does not apply in this case. Rather, Riviera argues that the facts do not bear out a claim for breach of contract based on Riviera's purported hindrance of SEC's performance. (Doc. 175, pp. 3-6). Construing the facts in SEC's favor, as this court must on Riviera's motion for summary judgment, there is a genuine issue of material fact as to whether Riviera hindered SEC's performance under the contract. As such, Riviera's motion for summary judgment on Count One is **DENIED**.

## V.    SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT IS DENIED.

SEC brings a motion for partial summary judgment in which it seeks a judgment holding that (1) Riviera "impliedly warranted to SEC that the plans and specifications produced by its engineer, CES and given to SEC to build the project was [sic] adequate to build the project," (2) proof that the "project could not be built according to the plan and specifications provided by Riviera" would "constitute a breach of . . . warranty," and (3) if SEC proves a breach of warranty, it may recover "all damages proximately resulting from the breach." (Doc. 128, p. 3).

As a preliminary matter, the second and third partial "judgments" that SEC requests would not be, if granted, judgments at all. If the court were to issue such judgments, it would

simply be pronouncing its interpretation of the law based on hypothetical facts. Rule 56 is appropriate when there "is no genuine issue as to any material fact." It is not a vehicle for obtaining an advisory ruling based on facts that the moving party may, or may not, establish at a later date. The motion, therefore, is **DENIED** insofar as SEC asks the court to rule that it would be a breach of warranty if SEC could prove that the project could not be built according to certain specifications and insofar as SEC asks the court to rule that, if it proves a breach of warranty, it may recover "all damages proximately resulting from the breach."

The remaining element of SEC's motion asks the court to hold that the initial work plans that CES produced on behalf of Riviera implicitly warranted to SEC that, if SEC followed the plans, an acceptable result would follow. SEC relies primarily on United States v. Spearin, 248 U.S. 132 (1918), and its progeny as the starting point for its argument. The plaintiff in Spearin contracted to build a dry dock for the federal government. Id. at 133. The scope of the project included relocating a sewer. Id. After the plaintiff relocated the sewer according to the government's specifications, a rainfall exposed a problem with the sewer system in the area of the plaintiff's project, rupturing the sewer and causing an unsafe working condition. Id. at 134. The government officials who were responsible for issuing the contract to the plaintiff did not know about the specific problem with the sewer, but they did know that the sewer had overflowed in the past. Id. Nobody communicated the past problems with the sewer to the plaintiff. Id. at 134-35.

After the sewer ruptured, the plaintiff told the government that he felt the problems with the sewer were:

> a menace to the work and that he would not resume operations unless the
> Government either made good or assumed responsibility for the damage that had
> already occurred and either made such changes in the sewer system as would

> remove the danger or assumed responsibility for the damage which might
> thereafter be occasioned by the insufficient capacity and the location and design
> of the existing sewers.

Id. at 135.  Although it was unsafe to the plaintiff and the government's property to work at the site without repairing the sewer, the government took the position that fixing the sewer was the plaintiff's responsibility.  Id.  The government annulled the contract after the parties reached a stalemate.  Id.  The court held that the outcome of the case turned on well settled, general rules of law.

> Where one agrees to do, for a fixed sum, a thing possible to be performed, he will
> not be excused or become entitled to additional compensation, because
> unforeseen difficulties are encountered.  Thus one who undertakes to erect a
> structure upon a particular site, assumes ordinarily the risk of subsidence of the
> soil.  But if the contractor is bound to build according to plans and specifications
> prepared by the owner, the contractor will not be responsible for the
> consequences of defects in the plans and specifications.  This responsibility of the
> owner is not overcome by the usual clauses requiring builders to visit the site, to
> check the plans, and to inform themselves of the requirements of the work[.]

Id. at 136 (citations omitted).  The court held that all of the plaintiff's work was to be done according to plans furnished by the government.  Id.  As such, the government warranted the adequacy of its plans, absolving the plaintiff of any responsibility for the consequences of the plans' insufficiencies.  The plaintiff could have terminated the contract himself when the government insisted that he should shoulder the burden of the broken sewer but, based on the foregoing warranty, the government's annulment of the contract was not justified.  The government, therefore, "became liable for all damages resulting from its breach."  Id. at 138.  See also Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987) ("Design specifications explicitly state how the contract is to be performed and permit no deviations.  Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results.  Detailed design

specifications contain an implied warranty that if they are followed, an acceptable result will be produced.").

SEC argues that the Supreme Court of Alabama adopted the <u>Spearin</u> holding in <u>Broyles v. Brown Engineering Co.</u>, 151 So. 2d 767 (Ala. 1963). In <u>Broyles</u>, the plaintiffs sued a civil engineering company for breaching a contract to provide plans to the plaintiffs for drainage in a proposed subdivision. <u>Id</u>. at 769. In a five-count complaint alleging breaches of express and implied agreements, the plaintiffs alleged that the defendant's engineering plans were defective. <u>Id</u>. The trial court granted the defendant's demurrer and the plaintiffs appealed. <u>Id</u>. On appeal, the defendant argued that, absent an express contract, it could not be held liable for its flawed engineering work unless the plaintiffs could establish, through a tort cause of action, the defendant's failure to exercise proper care. <u>Id</u>. at 769. The complaint did not make such an allegation; it was based on the breach of an implied warranty to provide adequate engineering plans. <u>Id</u>. at 770.

Thoroughly setting out the legal framework for the court's opinion, the court explained that, "[t]he difference between an expressed and an implied contract is merely in the mode of proof, the elements being the same, and where mutual agreement is contradicted by the statements of either party at the time, there being no expressed agreement, there can be no implication of contractual under-taking by that party." <u>Id</u>. Implied contracts are "true contract[s]." <u>Id</u>. The contractual agreement is "inferred from the circumstances, showing a mutual intention to so contract," but the implied contract cannot "arise contrary to law or the expressed declaration of the parties." <u>Id</u>. Still, if a contractual term is implied, it "is as much a part [of the written contract as] if expressly stated therein." <u>Id</u>. No special language is required to create such an implied warranty. "A warranty of work may exist . . . if the parties so intended,

without the use of any particular words in the contract." <u>Id</u>.  Summarizing:

> An implied contract arises where there are circumstances which, according to the
> ordinary course of dealing and common understanding, show a mutual intent to
> contract.  Such a contract must contain all the elements of an express contract,
> which rests on consent, and is to every intent and purpose an agreement between
> the parties, and it cannot be found to exist unless a contract status is shown.

<u>Id</u>.  If the implied agreement is shown, a party may recover for the other party's breach of the

implied agreement "based on failure to perform the special agreement, regardless of negligence."

<u>Id</u>.

    The court reversed the defendant's demurrer.  The court summarized the complaint as

alleging that the defendant knew why the plaintiffs commissioned the engineering work and that

the defendant held itself out as an expert.  <u>Id</u>. at 770-71.  "Common understanding and the

ordinary course of dealing," along with "the circumstances and the nature of the contract,"

convinced the court that the parties "mutually intended an agreement of guaranty."  <u>Id</u>. at 771.  A

contrary holding would "ignore practical and common sense implications that arise from

contractual dealings and negotiations as here presented in the complaint."  <u>Id</u>.

    The court then undertook to distinguish the civil engineering contract before it from

agreements with other professionals to provide certain services and also from other kinds of

agreements with civil engineers.  Contracts with "lawyers, physicians and architects, and

probably some other professions," do not typically imply a warranty of performance.  <u>Id</u>.  Also,

"under some circumstances civil engineers will not be held to have impliedly warranted or

insured favorable or certain results.  It all depends on the nature of the employment and the

particular services to be rendered."  <u>Id</u>.  Doctors do not provide implied warranties because the

practice of medicine "depends on factors beyond the control of the practitioner."  <u>Id</u>.  Similarly,

contracts with lawyers to provide legal services do not typically carry implied warranties

because of the vagaries of the legal profession.  Id.  Contracts for architectural services do not include implied warranties because an architect's "work is to a certain degree experimental or depends on the experiments and on production of materials by others," and also, "the law of physics, gravity and," apparently, "the rotation of the earth[.]"  Id.

Likewise, a civil engineer will not implicitly warrant his work if, for example, he is "employed to locate a government land line between tracts or areas."  Id. at 772.  That is because "[i]n determining this location, it is commonly known that he is dependent on obtaining a correct starting point for his survey – a point that is often obscured or is evidenced by misleading or false marks – marks that are made by someone else."  Id.    After explaining that doctors, lawyers, architects, civil engineers in certain contexts, and "probably other[]" service providers would not provide an implied warranty for their work, the court described several cases, including Spearin, as holding that, "in principle," a party who "furnishes plans and specifications for a contractor to follow in a construction job . . . thereby impliedly warrants their sufficiency for the purpose in view."  Id.

Applying its analysis to the complaint at issue on the demurrer, the court decided that the flawed engineering survey was "not entailed with unknown or uncontrollable topographical or landscape conditions" that would prevent a engineering survey prepared with the requisite amount of skill from being reasonably accurate.  Id.  Under the circumstances, the defendant "should expect to be charged with a guaranty of reasonable results."  Id.

This court does not find that either Spearin or Broyles provides a basis for holding on summary judgment that Riviera implicitly warranted that the first set of engineering plans it provided to SEC would be adequate to build the project without any subsequent revision. Distilled to its essence, Broyles found that the civil engineering firm provided an implied

warranty because the nature of its work and of its engagement justified the assumption, based only on the allegations in the complaint, that the parties both agreed that the civil engineering firm warranted its results. According to Broyles, other professions, and civil engineers in other contexts such as identifying the division between tracts of land, do not provide such warranties because the context of their engagement illustrates that they would not agree to such a warranty. In general, the possibility that circumstances beyond the service-provider's control - ranging from the earth's rotation to the necessity of relying on others to supply potentially faulty information - will preclude a finding that the service-provider implicitly acquiesced to providing a warranty.

Taking the facts in the light more favorable to Riviera on SEC's motion for summary judgment, all of the parties knew that it was possible, if not likely, that the original engineering designs would have to be altered because of unforeseen conflicts with pre-existing underground utilities. This understanding precludes a finding, as a matter of law, that the parties agreed that the first set of drawings would not be subject to change. In addition, like the civil engineer locating a government land line between tracts of land, Riviera, acting through its agent CES, could not have ascertained the location of the underground utilities without relying on other utility companies to communicate accurately the location of their underground lines, i.e., "marks that are made by someone else." Id. This is precisely the kind of situation in which Broyles contemplated an implied warranty would not be created. See also K.B. Weygand & Assocs., P.C. v. Deerwood Lake Land Co., 812 So. 2d 1165 (Ala. 2001) (explaining that "Broyles was limited to the facts of that case and did not state any broad general rule," then distinguishing and, in a concurrence, soundly criticizing the Broyles opinion).

To the extent that Spearin and the other federal cases the parties discuss directly apply to

this case, they do not support summary judgment on the issue of whether Riviera impliedly warranted its initial engineering plans. The <u>Spearin</u> decision is based on the parties' assumption that the government's plans were adequate. There is no mention of the parties' understanding that the government would likely have to alter its initial plans due to a possible problem with the sewer system. One of the remaining cases explains that the warranty is only implied if the parties intended to imply it, <u>Rick's Mushroom Serv. v. United States</u>, 521 F.3d 1338, 1346 (Fed. Cir. 2008) (recognizing that there is no implied warranty without the mutual intent to provide one), and the remaining cases either assume the existence of a warranty or hold that there is no claim based on the implied warranty because any deficiency in the specifications should have been clear. <u>Stuyvesant Dredging Co. v. United States</u>, 11 Cl. Ct. 853, 859-61 (Cl. Ct. 1987) <u>aff'd</u>, 834 F.2d 1576 (Fed. Cir. 1987) (denying <u>Spearin</u> claim based conclusion that specifications were "performance specifications" rather than "design specifications" and that the specifications, regardless of their categorization, were subject to predictable, disclaimed eventualities); <u>Comtrol, Inc. v. United States</u>, 294 F.3d 1357, 1365 (Fed. Cir. 2002) (differing site conditions claim denied because any deficiency in specifications should have been clear); <u>E.L. Hamm & Assocs. v. England</u>, 379 F.3d 1334, 1338-39, 1341-43 (Fed. Cir. 2004) (no claim if deficiency is a patent defect); <u>Martin K. Eby Constr. Co. v. Jacksonville Transp. Auth.</u>, 436 F. Supp. 2d 1276, 1308-09 (M.D. Fla. 2005) (describing <u>Spearin</u> and its Florida progeny as requiring governmental agencies to provide bidders with information that will not mislead them).

Based on the foregoing, the court **DENIES** the aspect of the motion for summary judgment that seeks a ruling that Riviera impliedly warranted the plans and specifications provided by CES to SEC.

## VI.     CONCLUSION

SEC's motion for summary judgment on the liquidated damages provision is

**GRANTED**.  Riviera's motion for summary judgment is **GRANTED** as to as to Count Two of

the complaint and **DENIED** as to Count One of the complaint.  SEC's motion for partial

summary judgment is **DENIED**.

**DONE** and **ORDERED** this 5th day of February, 2009.


/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE